We'll begin hearing argument in United States v. Booth. Mr. Tarasov, good morning. Good morning, Your Honor. May it please the Court, my name is Alexei Tarasov and I represent the Russian businessman Victor Booth, who has been sentenced to 25 years as part of a purported weapons trafficking conspiracy. Except, there never was any such conspiracy. Credible, newly discovered evidence shows that Andrew Smulyan, the only individual with whom Mr. Booth could have conceivably conspired, knew about the whole DEA sting operation from the get-go. Case law is clear that it is not possible to conspire with a government informant. The newly discovered evidence we presented together with our Rule 33 motion almost conclusively establishes that Mr. Smulyan began to cooperate with the Drug Enforcement Administration not after, but before Mr. Booth's takedown at the Bangkok Hotel. In the lower court, we presented... What's the evidence? Just the four or five pieces of evidence that you rely on for that purpose. Your Honor, the number one item of evidence that the defense relies is a fragment from a 2014 documentary film in which the lead agent in the case, one of the lead agents in the case, Agent William Brown, says on camera that Mr. Smulyan, quote, was a willing partner in this scenario. Now, just before that, Agent Brown said that... Willing partner in which scenario? The scenario, of course, indicates the elaborate plot to entrap Mr. Booth. The partner... It's not clear to me that that is... The DEA was trying to find a person that could lead to Booth. I think that's the proper inference from that documentary, isn't there? That is accurate. Agent Brown, in the documentary, says that we tried to find an individual that can lead us to Booth, that had worked with Booth in the past, and that penetration point... Why does that indicate that Smulyan was cooperating at that time? That's what the law enforcement people always try to do. They try and find someone to lead to somebody and then eventually conduct an investigation. But that doesn't mean that that person's cooperating. That means that by investigating that person, they may be able to investigate further to the ultimate target. There's one other place in the film, and that's at the 1 hour, 13 minutes, and 14 seconds mark, where another agent, the DEA team leader now, says this. In 2007, we contact with Andrew Smulyan. But in context, doesn't it appear that the agents are saying that Smulyan would be an unwitting partner? They were going to try to make use of him without letting him know that these confidential sources were in fact working with the DEA. Your Honor, the words, of course, mean what they say. If the government contended that they meant something different, that he was an unwitting partner, then there should have been, at the very least, an evidentiary hearing in the lower court, which was never granted. Okay, what other evidence do you have on this point? I mean, you have apparently that there's some conversation with his wife, make some statement, is that right? That she can deliver his testimony of some sort? Actually, that's not entirely accurate. Another piece of evidence that we have here is the fact that the supposed link of the DEA to Mr. Smulyan, Mr. Snow, was employed as a double agent for both the United States Drug Enforcement Administration and the British Intelligence Agency, MI6. On my evidence gathering trips to Asia, I've been approached by a group of individuals that indicated they were in receipt of a cache of sensitive correspondence that Mike Snow apparently authored for his British handlers. Now, why is that significant? Because it matches with the evidence we found on Mr. Smulyan's laptop computer, which we obtained from an information technology expert for Mr. Booth's former security assistant. The laptop was picked up in the country of Tanzania after the Sting operation, but was retained in the possession of this security expert until after the conclusion of the trial. The evidence on the laptop shows that Smulyan conducted research on the MI6 intelligence organization, and also it shows that Mike Snow, the supposed link of the DEA to Smulyan, offered Smulyan employment in the law enforcement capacity less than two years prior to the inception of the Sting operation. This clearly indicates that Snow was viewed by Smulyan as somebody associated with an intelligence agency of a major Western power, and somebody involved in the field of law enforcement. Now, the claim that Snow, in the space of less than two years, would transition from offering Smulyan employment as part of a police operation to prodding him to supply surface to air missiles to terrorist rebels would just be unrealistic. Why? I mean, there are lots of bad guys out there, to use a generic term, who cooperate with law enforcement, either thinking they're going to get a way to get by them. I mean, heck, probably everybody who's prosecuted in this room, who has been a prosecutor in this room, has had that experience. I'm just not sure I follow your rationale. Well, just two years prior to the Sting operation, Michael Snow offered Smulyan employment as part of a large police operation at $19,000 a month, which by 2005 standards was a lot of money. Even today. Smulyan knows that Snow is somebody associated with law enforcement, and also, quite likely, somebody from the intelligence community. Now, it would just be, just would strain credulity to assert that Snow would then offer Smulyan, less than two years from that point, to supply arms to terrorists. He is associated with an intelligence agency of the U.K., which is an ally of the United States, and the goal of this operation, and one of the charges in this conspiracy, was that the weapons would be used to shoot down American pilots. And that just doesn't... Well, but it's certainly not beyond the pale in terms of what we've generally experienced in the world. So let me just, the bottom line, what you want us to order is for the court to hold, remand this to the court for an evidentiary hearing where these issues can be explored further. That's accurate, Your Honor. Thank you. Thank you. And you've reserved a minute for rebuttal. One minute. Thank you, Mr. Tarasoff. Mr. Ju. May it please the court. My name is David Zhou. I'm an assistant United States attorney in the Southern District of New York, and I represent the government on this appeal. The district court properly denied Victor Boot's Rule 33 motion. First, the bulk of the evidence that Mr. Boot relies upon for his motion does not qualify as newly discovered under Rule 33. Second, even considering the merits of the information that Boot relies upon, the district court correctly found that the information is neither material nor likely to lead to an acquittal, which is what Boot needs to show in order to obtain either an evidentiary hearing or a new trial under Rule 33. But if he were able to show that, sorry, Smullyan was, in fact, a government agent, do you disagree with his argument that you can't conspire with a government agent if that's the extent of the conspiracy? That's certainly correct, Your Honor, that if Boot were to be able to show that Smullyan was a government agent from the start, before the arrest, before the DEA initiated Sting operation, then if he was acting as a government agent, Boot would not be able to conspire with him. But there's no evidence. The only evidence that postdates the conviction is, it seems to me, and the first appeal would be the documentary. Is that right? That's exactly right, Your Honor. Prior to that, all of it was out, was there before, and was ascertainable by him. That's correct, Your Honor. That's right. All of the evidence other than the documentary film, that existed before the conviction, and Boot has not proffered any evidence to show that he exercised due diligence in trying to obtain that information before the trial. As to the documentary, Mr. Boot argues that there's some ambiguity as to what the agent was saying. He didn't use the word unwitting. He used the word willing. Why shouldn't there have been a hearing to determine what was actually being said? Your Honor, no hearing was necessary because in Boot's motion, he takes the statements made by the agent out of context. And he takes certain words, such as partner and willing, and then uses dictionary definitions to argue illogically that those mean that Smullyan was, in fact, a government agent from the start. But in context, those statements made by Special Agent Brown do not demonstrate that the DEA had recruited Smullyan prior to the arrest. In fact, what Agent Brown said was that the DEA, quote, tried to find an individual that can lead us to Victor Boot, which had operated with Boot in the past, and that penetration point to us was Andrew Smullyan. And Agent Brown goes on to explain in the documentary that Smullyan was the perfect penetration point because he was both familiar with Mike Snow, who he had known since the 1990s, and Smullyan was a former associate of Boot. And furthermore, Smullyan at that point was in dire economic straits. And therefore, he would jump at the opportunity that the DEA confidential sources presented to him. Thus, in context, it's clear that the statements made by Agent Brown do not reference the fact that Smullyan was a government agent from the start, but rather that Andrew Smullyan was chosen by the DEA to be the penetration point for Victor Boot. And as Your Honor has mentioned, to investigate Andrew Smullyan first and then hopefully have that investigation lead to Victor Boot, which is exactly what happened here. He was the soft target. Exactly, Your Honor. What about this individual, the Snow point that your adversary was making related to the documentary? Was Snow portrayed in the documentary? I don't believe so, Your Honor. I don't know if Snow was portrayed in the documentary. I guess what he's trying to argue is that Smullyan knew that Snow was a government operative when he went into this deal, right? That's certainly my adversary's argument, Your Honor, but there's no evidence to support that. And in fact, the evidence that Boot has presented is problematic in many ways. First, the email that Mr. Tarasov mentioned comes from a laptop that purportedly belonged to Andrew Smullyan and which was recovered by a security assistant of Mr. Boot back in 2009. That was before the conviction. And there's no evidence proffered by the appellant to suggest why the security assistant who accompanied Boot to the Thailand meeting in March of 2008, why that person didn't bring the laptop forward earlier. There's no evidence proffered as to why Boot could not have obtained that laptop. And there's no evidence proffered as to what the chain of custody of that laptop is, how we can authenticate it, and whether it would be admissible as evidence. Furthermore, the email itself is problematic. The email is from an address that is sent by, quote, Mike Snow, a certain email address, to an email address to someone whose moniker is Axel Desmouge. And it talks obliquely about a police operation. And Mr. Tarasov accepts that on his face as a legal operation. But there's nothing to suggest that that was a legal operation. And furthermore, that email was sent in 2005, more than two years before the DEA initiated the investigation into Victor Boot. Therefore, a single email between Mike Snow and purportedly Andrew Smullyan in 2005 doesn't provide any probative evidence as to what the relationship between these two individuals was in 2007. And I also note that Smullyan knew Mike Snow beginning in 1993. And that was a very long relationship that they had. And so a single email taken out of context is not definitive as to whether Smullyan went into that operation with the belief that Mike Snow was working with the authorities. And, Your Honors, for those reasons, the government respectfully submits that district court's decision to deny Mr. Boot's Rule 33 motion should be affirmed. And unless the panel has any further questions, the government rests on its submissions. Thank you. Thank you, Mr. Zhou. I'm sorry for mispronouncing your name. No problem, Your Honor. Thank you. Mr. Tarasov. May it please the Court. I would like to begin with my adversary's contention that there was no newly discovered evidence aside from the documentary. In fact, there is one piece of newly discovered evidence that the Court specifically said was newly discovered, and that's the Thai immigration record that shows Smullyan leaving Bangkok on the day of the arrest, within 11 hours after the takedown at the Bangkok Hotel. How is that material? How is that material? How does that show that he was cooperating prior to the arrest? Sure. Well, it would just be virtually impossible for the government to get a defendant to cooperate in the space of only minutes after the arrest, and this is a major terrorism investigation where Mr. Smullyan . . . It's not a question of minutes. It's a question of hours, isn't it? I mean, isn't that normal, rather normal? You arrest somebody and immediately you try and get their cooperation? Your Honor, yes, and we also thought it was hours, but in fact it was minutes because Mr. Smullyan . . . Weren't these facts brought up at trial in any event? Not all of them. The government at trial suggested . . . But the essential . . . . . . Smullyan left on the day after. But the essential facts that Smullyan left right away unescorted by the agents.  That was presented at trial, correct, but . . . How is this new information different? Well, because, again, it was within only 11 hours, and this is a major terrorism investigation, and we're talking about placing a terrorist suspect that faces a potential life sentence into the economy class cabin of a trans-Pacific airliner with all the other passengers. And for the government to reach that level of comfort within the space of only minutes, and, again, it's minutes because we know that Agent Zaharashevich released Smullyan immediately after the arrest in Bangkok. They did not hold him. He just wandered about Thailand's capital for the day and then came to the airport. Thank you. Thank you, Your Honor. Thank you very much. We will reserve decision in this case.